

EXHIBIT
**A**

| | |
|---|---|
| **STATE OF MAINE**<br>**SOMERSET, ss** | **SUPERIOR COURT**<br>**CIVIL ACTION**<br>**DOCKET NO. 2021-19** |

| | | |
|---|---|---|
| **NATHAN SAUNDERS, and JUDY HOOK,**<br>**individually and on behalf of all others similarly**<br>**situated,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SAPPI NORTH AMERICA, INC. F/K/A S.D.** | : | **FIRST AMENDED CLASS ACTION** |
| **WARREN COMPANY, S.D. WARREN** | : | **COMPLAINT** |
| **COMPANY, SAPPI LTD., SCOTT PAPER** | : | |
| **COMPANY, KIMBERLY-CLARK** | : | **JURY TRIAL DEMANDED** |
| **CORPORATION, UPM – KYMMENE, INC.,** | : | |
| **NORTHERN SC PAPER CORPORATION,** | : | |
| **PERRY VIDEX, LLC, INFINITY ASSET** | : | |
| **SOLUTIONS, NEW MILL CAPITAL LLC,** | : | |
| **GO LAB, INC.,  HUHTAMAKI OYJ,** | : | |
| **HUHTAMAKI, INC., INTERNATIONAL** | : | |
| **PAPER COMPANY, VERSO** | : | |
| **CORPORATION, PIXELLE SPECIALITY** | : | |
| **SOLUTIONS, and PINE TREE WASTE, INC.** | : | |
| **D/B/A CENTRAL MAINE DISPOSAL.** | : | |
| | | |
| **Defendants.** | | |

Plaintiffs, Nathan Saunders and Judy Hook ("Plaintiffs"), individually and on behalf of a

proposed class of all other similarly situated persons ("Class Members" or the "Class"), sues

Defendant Sappi North America, Inc., f/k/a S.D. Warren Company ("Sappi"), S.D. Warren

Company ("S.D. Warren"), Sappi LTD, ("Sappi LTD"), Scott Paper Company ("Scott Paper"),

Kimberly-Clark Corporation ("Kimberly-Clark"), UPM – Kymmene, Inc. ("UPM"), Northern

SC Paper Corporation, ("Northern Paper") Perry Videx, LLC ("Perry Videx"), Infinity Asset

Solutions ("Infinity"), New Mill Capital LLC ("New Mill Capital"), Go Lab, Inc. ("Go Lab"),

Huhtamaki Oyj ("Huhtamaki Oyj"), Huhtamaki, Inc ("Huhtamaki"), International Paper Company ("International Paper"), Verso Corporation ("Verso"), Pixelle Speciality Solutions ("Pixelle"), and Pine Tree Waste, Inc. d/b/a Central Maine Disposal ("Pine Tree") (collectively "Defendants") based on personal knowledge, investigation of counsel and review of public documents and information, alleges as follows:

## INTRODUCTION

1.    Plaintiffs bring this class action against Defendants for the claims set forth below resulting from their intentional, knowing, reckless and/or negligent acts and omissions in connection with the discharge, distribution, disposal and/or spraying of per- and polyfluoroalkyl substances and their constituents ("PFAS"), including the resultant contamination of real property owned, and drinking water supplies owned and used, by the Plaintiffs and Class Members.

## PARTIES

2.    Plaintiff, Nathan Saunders, is a citizen of Maine and owner-occupier of the real property located at 30 Howe Road, Fairfield, Maine 04937. As a result of Defendants' conduct, including their operations at the Somerset, Winslow, Madison, Androsgoggin, Bucksport and Huhtamaki Mills (collectively "the Mills"), Nathan Saunders and his real property have been contaminated by egregiously high and plainly dangerous levels of PFAS. Nathan Saunders seeks relief on behalf of himself and as representative of all others who are similarly situated.

3.    On January 13, 2021, the private drinking water well located at 30 Howe Road, Fairfield, Maine 04937, was sampled by the State of Maine, and analytical results from this sampling showed the well to be contaminated with PFAS at more than **12,910 parts per trillion** ("ppt") – nearly **185 times greater** than the United States Environmental Protection Agency

2

("EPA") Health Advisory limit of 70 ppt. As a result of the contamination of Nathan Saunders' private drinking water well, groundwater, and soil, Nathan Saunders has suffered, amongst other damages set out herein, diminution in property value, loss of use and enjoyment of property, annoyance, upset, aggravation, inconvenience and the necessity for long-term medical monitoring.

4.      Plaintiff, Judy Hook, is a citizen of Maine and owner-occupier of the real property located at 48 Gibson Road, Clinton, Maine 04927. As a result of Defendants' conduct, Judy Hook and her real property have been contaminated by egregiously high and plainly dangerous levels of PFAS. Judy Hook seeks relief on behalf of himself and as representative of all others who are similarly situated.

5.      Upon information and belief, the private drinking water well located at 48 Gibson Road, Clinton, Maine 04927 is contaminated with PFAS.

6.      Defendant Sappi is a wholly owned subsidiary of Sappi LTD. Sappi is a corporation organized under the laws of, and existing in, the Commonwealth of Pennsylvania, with its principal place of business located at 225 State Street, Boston, Massachusetts 02109.

7.      Defendant S.D Warren Company is a corporation organized under the laws of, and existing in, the Commonwealth of Pennsylvania, with its principal place of business located at 225 State Street, Boston, Massachusetts. Upon information and belief, S.D. Warren was a wholly owned subsidiary of Scott Paper Company from 1967 to 1995 when it was sold to Sappi LTD.

8.      Sappi and/or S.D. Warren currently owns and operates the Somerset Mill, a 2,500 acre plant that manufactures paper, bleached chemical pulp, and biosolids, located at 1329 Waterville Road, Skowhegan, Maine 04976.

9. Defendant Sappi LTD is a foreign company organized under the laws of, and existing in, the country of South Africa, with its principal place of business located in Rosebank, Johannesburg, South Africa.

10. Upon information and belief, Sappi LTD acquired all or substantially all of the Somerset Mill's manufacturing assets from Scott Paper Company in 1995, and continued to produce paper and paper products using and disposing, among other substances, PFAS, in essentially the same manner as all previous owners and operators of the Somerset Mill including, but not limited to, Scott Paper Company.

11. Defendant Scott Paper Company is a corporation organized under the laws of, and existing in, the State of Delaware, with its principal place of business located at 351 Phelps Drive, Irving, Texas 75038. Upon information and belief, Scott Paper Company was the owner of S.D. Warren from 1967 until 1995 when S.D Warren was sold to Sappi LTD.

12. Upon information and belief, Scott Paper Company was the owner of S.D. Warren from 1967 until 1995 when S.D Warren was sold to Sappi LTD.

13. Defendant Kimberly-Clark is a corporation organized under the laws of, and existing in, the State of Delaware, with its principal place of business located at 351 Phelps Drive, Irving, Texas 75038. Upon information and belief, Scott Paper Company was a wholly owned subsidiary of Kimberly-Clark at all times material hereto.

14. Upon information and belief, from 1967 to the present, in respect of the ownership and operation of the Somerset Mill, S.D. Warren:

      a. was insufficiently capitalized and maintained insufficient assets, including liability insurance coverage, considering the conduct alleged more fully herein;

4

      b.   was intermingling funds between itself and the personal and/or corporate assets of the Scott Paper Company, Kimberly Clark, Sappi or Sappi LTD;

      c.   failed to have any functioning officers, directors, members and managers;

      d.   failed to observe corporate formalities evidencing a distinction in fact between itself and the other Defendants;

      e.   was a mere instrumentality of the other Defendants in the commission of the conduct alleged more fully herein; and/or

      f.   was maintained and utilized for the express or implied purpose of committing negligent, careless, reckless, willful, wanton and malicious acts of wrongdoing with impunity by attempting to insulate the other Defendants from potential liability in connection with the conduct alleged more fully herein, thereby exposing Plaintiffs and all others similarly situated to unjust losses and damages.

15.      Upon information and belief, Scott Paper Company was also the owner of the now demolished Winslow Paper Mill, a plant that manufactured paper, bleached chemical pulp, and biosolids using or containing PFAS, located in Winslow, Maine 04901, from 1950 to 1995 when it was sold to Kimberly-Clark. Kimberly-Clark thereafter owned and operated the Winslow Paper Mill until 1997 when it was dismantled.

16.      Defendant Huhtamaki Oyj is a foreign company organized under the laws of, and existing in, the country of Finland, with its principal place of business located in Espoo, Finland.

17.      Defendant Huhtamaki is a wholly owned subsidiary of Huhtamaki Oyj. Huhtamaki is a corporation organized under the laws of, and existing in, the state of Delaware, with its principal place of business located at 9201 Packaging Drive, De Soto, Kansas 66018.

18.     Huhtamaki currently owns and operates the Huhtamaki facility, a plant that manufactures paper and paper products using and disposing of, among other substances, PFAS, located at 242 College Avenue, Waterville, Maine 04903.

19.     The Huhtamaki facility, was originally constructed, owned, and operated by Keyes Fibre Company from 1903 to 1927 when it was purchased by Rex Pulp Products Company. Thereafter, Rex Pulp Products Company assumed Keyes Fibre Company's name.

20.     Rex Pulp Products Company d/b/a Keyes Fiber Company, owned and operated the Huhtamaki facility until 1978, when it was purchased and merged with ANC, Inc. which assumed Keyes Fibre Company's name.

21.     ANC, Inc. d/b/a Keyes Fiber Company, owned and operated the Huhtamaki facility until 1981, when it was purchased by Van Leer Packaging.

22.     Van Leer Packaging owned and operated the Huhtamaki facility from 1981 until it was bought, and merged with Huhtamaki in 1999. Thereafter, Huhtamaki was known as Huhtamaki – Van Leer until 2001, when it changed its name to Huhtamaki Oyj.

23.     Huhtamaki Oyj and Huhtamaki, Inc. continued to produce paper and paper products using and disposing, among other substances, PFAS, in essentially the same manner as all previous owners and operators of the Huhtamaki Facility including, but not limited to, Keyes Fibre Company.

24.     Defendant UPM-Kymmene, Inc. is a foreign company organized under the laws of, and existing in, the country of Finland, with its principal place of business located in Helsinki, Finland.

25.     Defendant Northern SC Paper Corporation is a corporation organized under the laws of, and existing in, the state of Delaware, with its principal place of business located at 620 Eighth Avenue, 18th Floor, New York, New York 10018.

26.     Defendant Perry Videx, LLC is a company organized under the laws of, and existing in, the state of New Jersey, with its principal place of business located at 25 Mount Laurel Road, Hainesport, New Jersey 08036.

27.     Defendant Infinity Asset Solutions is a foreign company organized under the laws of, and existing in the country of Canada, with its principal place of business located at 63 Maplecrete Road, Concord, Ontario.

28.     Defendant New Mill Capital, LLC is a company organized under the laws of, and existing in the state of Delaware, with its principal place of business located at 575 Lexington Avenue, 4th floor, New York, New York 10022.

29.     Upon information and belief, in 2019, Defendants Perry Videx, Infinity, and New Mill sold Madison Paper Industries Mill to Go Lab, Inc.

30.     Defendant Go Lab, Inc. is a corporation organized under the laws of, and existing in Delaware with a principal place of business located at 137 High Street, Belfast, Maine 04915.

31.     Defendants Northern Paper and UPM, jointly owned and operated the Madison Paper Industries Mill that manufactures paper, bleached chemical pulp, and biosolids using or containing PFAS, located on Maine Street, Starks, Maine 04911 from 1980 to 2016 when the Madison Paper Industries Mill was sold to Perry Videx, Infinity Asset Solutions, and New Mill Capital. Perry Videx, Infinity Asset Solutions and New Mill Capital in turn owned and operated the Madison Paper Industries Mill until 2019 when they sold the same to Go Lab. Upon

7

information and belief, Go Lab is the current owner and operate of the Madison Paper Industries Mill.

32.     Defendant International Paper is a corporation organized under the laws of, and existing in, the State of New York, with its principal place of business located at 6400 Poplar Ave, Memphis, Tennessee 38197.

33.     Defendant Verso Corporation is a corporation organized under the laws of, and existing in, the State of Delaware, with its principal place of business located at 8540 Gander Creek Dr, Miamisburg, Ohio 45342.

34.     Defendant Pixelle Specialty Solutions is a company organized under the laws of, and existing in, the State if Ohio, with its principal place of business located at 228 S Main St, Spring Grove, Pennsylvania 17362.

35.     In 1965, International Paper established the Androscoggin Paper Mill. Since that time, Androscoggin Mill has manufactured paper, bleached chemical pulp, and biosolids, and is located at 300 Riley Road, Jay, Maine 04239.

36.     In 1930, Maine Seaboard Paper Company established the Bucksport Paper Mill located at 2 River Road, Bucksport, Maine 04416. From 1930 until 2014, Bucksport Mill manufactured paper, bleached chemical pulp, and biosolids.

37.     By 1947, the Bucksport Mill was under the control of St. Regus Paper Company, and remained so until 1984, when St. Regis Paper Company merged with and into Champion International Corp.

38.     International Paper bought Champion International Corp. and acquired all or substantially all of the Bucksport Mill's manufacturing assets from Champion International Corp. in 2000, and continued to produce paper and paper products using and disposing, among

other substances, PFAS, in essentially the same manner as all previous owners and operators of the Bucksport Mill including, but not limited to, Champion International Corp.

39.     Verso bought all of International Paper's coated paper producing mills, including all or substantially all of the Bucksport and Androscoggin Mill's manufacturing assets from International Paper in 2006, and continued to produce paper and paper products using and disposing, among other substances, PFAS, in essentially the same manner as all previous owners and operators of the Bucksport and Androscoggin Mills including, but not limited to, International Paper.

40.     In 2019, Pixelle Specialty Solutions acquired Androscoggin Mill, including all or substantially all of the Androscoggin Mill's manufacturing assets from Verso, and continued to produce paper and paper products using and disposing, among other substances, PFAS, in essentially the same manner as all previous owners and operators of the Androscoggin Mills including, but not limited to, Verso.

41.     Defendant Pine Tree is a domestic corporation organized under the laws of, and existing in, the state of Maine, with its principal place of business located at 25 Greens Hill Lane, Rutland, Vermont 05701. Upon information and belief, Pine Tree owned, controlled, and operated a landfill in Fairfield, Somerset County, Maine, formerly owned by Central Maine Disposal Corporation and contracted with the other Defendants to retain and dispose of PFAS-containing biosolids from the Mills and elsewhere at said landfill.

42.     Defendant Pine Tree is the successor in interest to Central Maine Disposal and has assumed its rights, duties, and liabilities. Pine Tree continued to contract with the other Defendants to retain and dispose, among other substances, PFAS, in essentially the same manner as all previous owners and operators of Central Maine Disposal landfill.

9

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this action pursuant to 14 M.R.S.A. § 704-A.

44.     Venue properly lies in this Court pursuant to 14 M.R.S. § 505.

45.     This Court has jurisdiction over the parties because, the Defendants resided, transacted business, were found, or had agents in the State of Maine, and because a substantial part of the events giving rise to Plaintiff's claims occurred in the State of Maine.

46.     On information and belief, Defendants have systematically transacted and conducted business in the State of Maine, and these causes of action arise, in part, from the same.

47.     On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and the State of Maine.

48.     On information and belief, at all relevant times, Defendants derived and continue to derive substantial revenue from their financial activities in the State of Maine including, but not limited to, the operation of the Mills, and the sale, distribution or spreading of substances containing PFAS throughout the State of Maine.

49.     On information and belief, at all relevant times, Defendants committed tortious acts within the State of Maine causing injury within the State of Maine, out of which act(s) these causes of action arise.

50.     This action is non-removable because there is incomplete diversity of residents and no substantive federal question is presented.

10

## FACTUAL ALLEGATIONS

*Chemical Characteristics of PFAS*

51.     Per- and polyfluoroalkyl compounds are wholly synthetic chemicals that do not exist in nature.

52.     There are numerous chemicals in the PFAS family, two of which are perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").

53.     PFOS and PFOA have been widely used in industrial processes and in commercial products due to their propensity to repel water, dirt, oil, and grease.

54.     PFOS and PFOA have unique properties that make them persistent, bio-accumulative, and toxic.

55.     PFOS and PFOA can persist in the environment indefinitely due to the strength of multiple carbon-fluorine bonds.  In other words, PFOS and PFOA break down very slowly in the environment, if at all, earning them the nickname "forever chemicals."

56.     Indeed, PFOS and PFOA are thermally, chemically, and biologically stable, and therefore resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

57.     PFOS and PFOA are also water soluble, making them mobile in groundwater and the environment. Further, because PFOS and PFOA repel organic materials, they readily leach through soil, impacting groundwater.

58.     Typical water treatment systems did not and do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.[1]

---

[1] Just under half (49%) of Maine's citizens are served water by Community Water Systems, which are regulated under the federal Safe Drinking Water Act administered through Maine CDC's Drinking Water Program (DWP) – the remaining 51% obtain their drinking water from residential wells that are not subject to federal or state

59.     Similarly, chlorine and other disinfectants that are typically added to drinking water systems did not and do not remove PFOS or PFOA from contaminated water.

60.     Compounding the fact that PFOS and PFOA are notoriously difficult to remove from contaminated water supplies, toxicology studies have shown that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

61.     What is more, PFOS and PFOA have a half-life within the human body of anywhere from 2 to 9 years, and the chemicals are known to cross the placenta from mother to fetus and can be passed to infants through breast milk.

62.     These characteristics contribute to a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels.

63.     PFOS and PFOA exposure is associated with, among other injuries, increased risk in humans of cancer, including, but not limited to, kidney and reproductive cancers. PFOS and PFOA have also been linked with other physical injuries, diseases and disorders including, but not limited to thyroid disease, high cholesterol, ulcerative colitis, pregnancy-induced hypertension, and preeclampsia, as well as reduced immunological functions including decreased responsiveness to vaccines. PFOS and PFOA have a high latency period meaning that injuries can manifest years after exposure to the chemicals.

---

regulation or testing requirements. Tipton, Meredith, Managing PFAS in Maine - Final Report from the Maine PFAS Task Force § (2020).

*The Defendants' Discharge, Distribution, and Spreading of PFAS Throughout Somerset and Kennebec Counties*

64.     PFAS have been used in paper and cardboard food packaging since the 1950s, mostly as coatings to prevent the paper material from soaking up fats and water, but also in printing inks and as moisture barriers.

65.     PFAS treated paper is a barrier or repellent against grease, stains and water to keep the migration of grease and water from the food to acceptable levels during transport, storage and consumption of the food.

66.     Upon information and belief, at all times material hereto, and since at least 1967, Defendants have each used PFAS in making treated paper products for food packaging and other applications at the Mills.

67.     This PFAS treated paper is made to repel oil and grease in food packaging such as pizza boxes, sandwich wrappers, and microwave popcorn bags, as well as other applications.

68.     In fact, upon information and belief, the Mills have at all times specialized in producing PFAS-treated paper products.

69.     Upon information and belief, the processes employed by the Defendants between 1967 and the present in producing these PFAS-treated paper products create PFAS residuals or byproducts that have been directly discharged into the surrounding groundwater and surface waters where they migrate and cause contamination.

70.     Moreover, for every pound of PFAS that is directly discharged into surrounding water sources, nine pounds of PFAS end-up in paper mill sludge, also known as biosolids, that are either sent to landfills, used as fuel, or repurposed and distributed as fertilizer.

71.     Indeed, upon information and belief, in addition to directly discharging PFAS, the Defendants each: (1) disposed of PFAS-containing biosolids in landfills; (2) sold or

distributed PFAS-containing biosolids for fuel or fertilizer; and (3) sprayed PFAS-containing fertilizer. Each of these activities occurred throughout Somerset and Kennebec Counties between at least 1967 and the present, poisoning the water, the soil, the animals, the plants, and ultimately, the people therein.

*PFAS Contamination in Somerset and Kennebec County*

72.     Upon information and belief, Defendant Pine Tree Waste, Inc., illegally and/or negligently disposed of 40,000 cubic yards of PFAS-containing biosolids from the Mills every year from at least 1976 until 1984 in landfills, owned, operated and controlled by Pine Tree in Fairfield, Maine.

73.     In late 2016, PFAS chemicals were found to be present at levels up to 1,420 ppt in the milk of a Maine dairy farm that had historically applied municipal wastewater and papermill residuals to its fields.

74.     Also in 2016, paper mill sludge was found to have contaminated a century old dairy farm in Arundel, Maine, after the nearby Kennebunk, Kennebunkport and Wells Water Districts found elevated levels of PFAS in a well on the property.

75.     In response to these early reports of isolated contamination, Maine's Department of Environmental Protection ("DEP") required testing of wastewater treatment plants and papermill residuals, like biosolids, prior to land spreading as fertilizer, as well as testing of finished compost produced from these same residuals. This testing indicated that:

> 65% of residuals like biosolids exceeded screening levels for PFOA, and 93% exceeded the same levels for PFOS;
>
> 89% of finished compost samples exceeded the screening level for PFOA, and 74% exceeded the same level for PFOS; and
>
> 19% of fields tested following spraying of biosolids exceeded the soil screening levels for PFOA, and 57% exceeded the levels for PFOS.

14

76.     In February 2020, Maine's Department of Agriculture, Conservation and Forestry again found that milk from a dairy farm in Somerset County had levels of PFOA that were higher than the limit of 210 ppt set by the state. Specifically, the milk from the farm revealed levels of 12,700, 14,900 and 32,200 ppt – the highest ever recorded in milk in the United States.

77.     These results prompted additional testing throughout Maine and Somerset County which, as of December 2020, revealed that at least eighteen private wells in Fairfield, Maine, have levels of PFAS higher than the 70 ppt limit set by EPA.

78.     Nathan Saunders is the owner of one such private well, and has only recently learned that his drinking water has been contaminated with extremely dangerous levels of PFOS and PFOA totaling at least 12,910 ppt.

79.     Upon information and belief, Maine Department of Environmental Protection and or the Maine Department of Agriculture, Conservation and Forestry have also found signifigant levels of PFAS in farms in and around the town of Clinton in Kennebec County near private residential wells including Judy Hook's private well.

80.     Upon information and belief, PFAS-contianing biosolids were spread by the owners and operators of the mills, throughout Somerset and Kennebec Counties.

81.     Upon information and belief, International Paper spread at least 93,594 tons of PFAS-containing biosolids throughout Maine, and Kennebec County specifically,  from 1988 until 1998.

82.     Upon information and belief, from 2013-2015, Verso Paper deposited at least 46,234 tons of PFAS-containing biosolids throughought Kennebec County.

83.     Upon information and belief, Kimberly Scott deposited PFAS containing biosolids into the Unity Township landfill in Kennebec County.

84.     Upon information and belief, PFAS containing biosolids from Winslow Mill and Sappi Mills were deposited upon Defendants' properties adjacent to the Kennebec River, where it would leach into the surface waters of the Kennebec river.

85.     In addition, Nathan Saunder's private well sampling revealed excessive concentrations of other PFAS chemicals, including perfluorononanoic acid ("PFNA"), perfluorodecanoic acid ("PFDA"), perfluorohexanoic acid ("PFHxA"), and perfluoroheptanoic acid ("PFHpA"). The combined PFAS concentrations in Plaintiff's drinking water supplies exceeds 20,000 ppt.

86.     Extremely high levels of PFAS contamination of groundwater typically occur in areas where: (1) commercial operations use PFAS in their manufacturing processes and release or discharge PFAS wastes directly on site; (2) PFAS materials are disposed in landfills or other off-site disposal grounds, from which PFAS compounds then leach or escape into groundwater; or (3) PFAS biosolids have been sold and spread as fertilizer on agricultural land.

87.     Plaintiffs and the other Class Members have owned property or resided in Somerset County and/or Kennebec County during the time Defendants have been engaging in precisely these types of activities involving PFAS, thereby causing widespread contamination and actually exposing the community to toxic levels of the chemicals that are known to cause debilitating and catastrophic illnesses and diseases.

### CLASS ACTION ALLEGATIONS

88.     Plaintiffs seek relief on behalf of himself and as representative of all others who are similarly situated. Pursuant to Maine Rules of Civil Procedure 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a class defined as follows:

all natural persons who lived or owned property in Somerset County or Kennebec County, Maine, for a period of one (1) year or more at any time between 1967 and the present.

89.     Excluded from the Class are Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who have been currently diagnosed with cancer or illness, disease or disease process of the kind caused by PFAS; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

90.     Plaintiffs hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

91.     The proposed Class meets the criteria for certification under Me. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

92.     **Numerosity. Me. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, the proposed Class includes tens of thousands of current and former residents and property owners who were unlawfully exposed to PFAS. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

93.     **Commonality. Me. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.  Whether Defendants' conduct was negligent;

b.  Whether Defendants' conduct constitutes a public nuisance;

c.  Whether Defendants' conduct constitutes an abnormally dangerous activity;

d.  Whether Defendants owed a duty of care to Class Members;

e.  Whether the duty of care owed to the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of PFAS;

f.  Whether Defendants breached their duty to warn the Class of, and protect the Class from, the long-term health risks and consequences of exposure to high levels of PFAS;

g.  Whether medical monitoring and early detection will provide benefits to Members of the Class;

h.  Whether the PFAS contamination described herein substantially interfered with Plaintiffs' and Class Members' use and enjoyment of their property;

i.  Whether the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of Plaintiffs and the Class;

j.  Whether Defendants caused the devaluation of the Plaintiffs and Class Members' properties;

k.  Whether Defendants caused PFAS to enter, invade, intrude upon or injure the property rights of Plaintiffs and the Class; and

l.  Whether Plaintiffs and Class Members are entitled to relief.

94.  **Typicality. Me. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiffs claims are typical of those of the putative Class Members. Plaintiffs are owner-occupiers of real property in Fairfield, Maine, within Somerset County, or property in Clinton, Maine, within

Kennebec County, and have resided in the Class Zone for at least one year. Plaintiffs and their respective properties have had exposure to PFAS released by the Defendants in various forms, as have all other Class Members. That exposure has resulted in an increased risk of illness and disease in Plaintiffs, and a diminution in value to their real property, as it has for all Class Members.

95.     **Adequacy. Me. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs is a Member of the Class and is committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating complex class actions and toxic torts, including claims for medical monitoring. Plaintiffs intend to vigorously prosecute this case, and they will fairly and adequately protect the interests of Class Members.

96.     **Superiority. Me. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against the Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action

device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

97.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

98.     Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**COUNT I**
**MEDICAL MONITORING**

99.     Plaintiffs repeat, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

100.    Plaintiffs and Class Members have been actually and significantly exposed to levels of dangerous PFAS that are far higher than normal background levels. PFAS is a dangerous, toxic substance that has been proven to cause disease and illness in humans, including certain kidney and reproductive cancers.

101.    Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS is the direct and proximate result of each of Defendants' intentional, willful, wanton, reckless or negligent acts or omissions in connection with the use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties.

102.    As a direct and proximate result of each of Defendants' intentional, willful, wanton, reckless or negligent acts or omissions in connection with the use, emission, discharge,

disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Plaintiffs and the Class Members are at an increased risk of developing cancer, and other illness, disease and disease processes, resulting in their present medical need for periodic diagnostic medical examinations.

103.    Diagnostic testing for early detection of cancer and other illness, disease and disease processes caused by exposure to PFAS is reasonably and medically necessary to assure early diagnosis and effective treatment of the disease.

104.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illness, disease and disease processes. As a direct and proximate result of each of Defendants' intentional, willful, wanton, reckless or negligent acts or omissions in connection with the use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection of the onset of illnesses, disease processes or disease.

105.    Monitoring procedures exist that make possible the early detection of cancer, the disease processes of cancer, and the progression of biomarker abnormalities, and other illness, disease and disease processes. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintifsf and the Class Members to Defendants' PFAS emissions.

106.    Plaintiffs and the Class Members' claims are based solely on the amount of exposure to PFAS caused by the Defendants as aforesaid. Therefore, any alleged alternative

exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Member's claims in this case.

107. As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

## COUNT II
## ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY

108. Plaintiffs repeats, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

109. Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties constitutes an ultrahazardous activity.

110. Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties is an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The procedures utilized by Defendants in the use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties caused contamination of PFAS, which poses a high degree of risk to Plaintiffs and the Class Members.

111. PFAS toxicity, persistence in the environment and in the human body, and other properties pose an inherent and extraordinary danger of lasting contamination of property and of threats to human health.

112. The contamination of the property, drinking water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from the Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties.

113. There is a reasonable likelihood that the Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties will result in life-threatening cancer and other illness, disease and disease processes. This risk cannot be eliminated as long as PFAS is released into populated areas. Likewise, it was completely inappropriate for Defendant to engage in these activities in a populated area while at the same time causing large amounts of PFAS to be dispersed and purposefully distributed into the surrounding community.

114. Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease or disease processes.

115. The activities conducted by Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

116. Because these activities are ultrahazardous, Defendants are strictly liable for any injuries proximately resulting therefrom.

117. As a direct and proximate result of Defendants' ultrahazardous activity and the exposure to PFAS resulting therefrom, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience.

## COUNT III
## PRIVATE NUISANCE

118.   Plaintiffs repeats, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

119.   At all times relevant hereto, Defendants knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution and spraying throughout Somerset and Kennebec Counties would cause injury to Plaintiff, the Class Members and their property.

120.   Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in Somerset and Kennebec Counties and the surrounding area.

121.   The Defendants' contamination of real property in Somerset and Kennebec Counties with PFAS has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense. Defendants' conduct has also substantially interfered with the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member so chooses.

122.   Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of Plaintiffs and the Class Members.

123.   As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, and

the exposure to PFAS resulting therefrom, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience.

## COUNT IV
## PUBLIC NUISANCE

124.    Plaintiffs repeat, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

125.    At all times relevant hereto, Defendants knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution and spraying throughout Somerset and Kennebec Counties would cause injury to Plaintiff, the Class Members and their property.

126.    Plaintiffs and Class Members have a common right to enjoy their real property free of dangerous contamination and to live their lives without unreasonable exposure to toxic chemicals.

127.    Defendants' unreasonable use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties substantially and unreasonably infringes upon and transgresses this public right.

128.    Defendants knew or should have known that the levels of PFAS used, emitted, discharged, disposed, distributed and sprayed throughout Somerset and Kennebec Counties would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

129.    Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties caused those who lived or owned property in

Somerset and Kennebec Counties to come into contact with high levels of PFAS on a routine and constant basis, causing property damage and a substantially elevated risk of cancer.

130. As a direct and proximate result of the Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Plaintiffs and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

131. As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, PFAS continuously invaded and contaminated the areas surrounding Plaintiffs and the Class Members, thereby exposing their properties and bodies to PFAS.

132. As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, and the exposure to PFAS resulting therefrom, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience.

## COUNT V
## STATUTORY NUISANCE

133. Plaintiffs repeat, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

134. 17 M.R.S.A. § 2701 states that "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages ..."

135.    Under 17 M.R.S.A. § 2802, such nuisances include the "… use of any building or place for the exercise of a trade, employment or manufacture that, by noxious exhalation, offensive smells or other annoyances, [which] becomes injurious and dangerous to health, comfort or property of individuals or of the public …", including, but not limited to, the tainting of wells, aquifers, rivers, streams or ponds.

136.    At all times relevant hereto, Defendants knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution and spraying throughout Somerset and Kennebec Counties would cause injury to Plaintiffs, the Class Members and their property.

137.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in Somerset and Kennebec Counties and the surrounding area.

138.    The Defendants' contamination of real property in Somerset and Kennebec Counties with PFAS has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense. Defendants' conduct has also substantially interfered with the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member so chooses.

139.    Plaintiffs and Class Members also have a common right to enjoy their real property free of dangerous contamination and to live their lives without unreasonable exposure to toxic chemicals.

27

140. Defendants' unreasonable use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties substantially and unreasonably infringes upon and transgresses this public right.

141. As a direct and proximate result of the Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Defendants are liable for damages under 17 M.R.S.A. § 2701, including damages for real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience

## COUNT VI
## NEGLIGENCE

142. Plaintiffs repeat=, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

143. Defendants owed Plaintiffs and Class Members a duty to use, emit, discharge, dispose, distribute and spray PFAS throughout Somerset and Kennebec Counties in a manner which would not cause Plaintiffs and the Class Members injury or harm, and Plaintiffs and the Class Members were foreseeable victims located within the scope of the risk created by the Defendants' conduct.

144. Defendants negligently breached their duty of care by using, emitting, discharging, disposing, distributing and spraying PFAS throughout Somerset and Kennebec Counties, by failing to take steps to minimize or eliminate the release of PFAS, by failing to utilize alternative procedures that would not result in the release of PFAS, by failing to institute proper procedures and training for response to releases of PFAS, and by using, emitting, discharging, disposing, distributing and spraying PFAS into a populated community.

145.    Defendants owed Plaintiffs and Class Members a duty of reasonable care commensurate with the risk of using, emitting, discharging, disposing, distributing and spraying PFAS.

146.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which PFAS used, emitted, discharged, disposed, distributed and sprayed throughout Somerset and Kennebec Counties was likely contaminating property at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

147.    Defendants negligently breached their duties by, among other things:

a.     Emitting dangerous amounts of PFAS into the water;

b.     Selling, distributing and spraying PFAS-containing biosolids;

c.     Failing to employ safe methods to adequately control or eliminate PFAS discharge;

d.     Failing to use alternative procedures which would not result in the discharge of PFAS into neighboring communities;

e.     Failing to locate their PFAS processing to an unpopulated, or at least much less populated, area; and

f.     Failing to warn neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure.

148.    As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property

damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience.

## COUNT VII
## WILLFUL AND WANTON CONDUCT

149.    Plaintiffs repeat, realleges, and incorporates by reference all allegations of this Complaint as if set forth more particularly at length here.

150.    At all times relevant, Defendants owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and those living or owning real property in Somerset and Kennebec Counties.

151.    Upon information and belief, Defendants were, at all times relevant, aware that PFAS is highly carcinogenic, mutagenic and/or otherwise harmful to humans.

152.    Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the discharge of PFAS, including the risk of causing various forms of cancer in the surrounding population.

153.    Upon information and belief, Defendants were, at all times relevant, aware that their use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, and the production of paper, paper pulp, and/or biosolids at the Mills, actually resulted in the unreasonably dangerous emission of PFAS into the surrounding communities.

154.    Notwithstanding this actual knowledge, Defendants breached their duties by, among other things:

30

a.     Emitting dangerous amounts of PFAS into the water;

b.     Selling, distributing and spraying PFAS-containing biosolids;

c.     Failing to employ safe methods to adequately control PFAS discharge;

d.     Failing to use alternative procedures which would not result in the discharge of PFAS into neighboring communities;

e.     Failing to locate their PFAS processing facilities in an unpopulated or less populated area;

f.     Failing to warn neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure;

g.     Failing to take steps to minimize or eliminate the release of PFAS through biosolids or otherwise, by failing to utilize alternative procedures that would not result in the release of PFAS; and

h.     Failing to institute proper procedures and training for response to releases of toxic PFAS.

155.     Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable PFAS discharge constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members.

156.     As a direct and proximate result of Defendants' willful, wanton, reckless and outrageous use, emission, discharge, disposal, distribution and spraying of PFAS throughout Somerset and Kennebec Counties, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss

of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against all Defendants as follows:

a.   For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b.   For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c.   For an award to Plaintiffs and the Class Members in an amount sufficient to compensate them for real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience;

d.   For an award to fund a medical monitoring program in an amount determined just and reasonable;

e.   For an award of punitive damages as allowed by law and in an amount to be determined;

f.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

g.   For prejudgment interest on all amounts awarded;

h.   For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

i.   Injunctive relief under Rule 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the

medically necessary diagnostic testing for the early detection of illness, disease or disease process; and

ii. Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (medical monitoring, ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, and willful and wanton conduct).

i. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

Brian H. Mahany (BOB # 003269)
**MAHANY LAW**
8112 W. Bluemound Road, Suite 101
Milwaukee, WI 53213
Phone: (414) 258-2375
brian@mahanylaw.com

M. Elizabeth Graham**
**GRANT & EISENHOFER P.A.**
One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
Phone: 415-789-4367
egraham@gelaw.com

Adam J. Gomez**
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Floor

34

Wilmington, DE 19801
Phone: 302-622-7000
agomez@gelaw.com

Adam Stoltz**
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Floor
Wilmington, DE 19801
Phone: 302-622-7000
astoltz@gelaw.com


**Pro Hac Vice* Forthcoming
*Attorneys for Plaintiffs and the Putative
Class*